# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. |
| BEACH COMMUNITY BANCSHARES, INC., |  |
| Debtor. |  |

## MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b); FED. R. BANKR. P. 2002, 6004, 9014 AND 9019; (I) APPROVING (A) BIDDING PROCEDURES AND (B) THE FORM AND MANNER OF NOTICE OF (i) THE SALE OF CERTAIN ASSETS AND (ii) GRANTING RELATED RELIEF; (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS; (III) WAIVING THE 14-DAY STAY OF FED. R. BANKR. P. 6004(h) AND REQUEST FOR EMERGENCY HEARING TO CONSIDER BIDDING PROCEDURES

The Debtor Beach Community Bancshares, Inc. ("BCB" or the "Debtor") submits this motion (the "Motion")[1] seeking the entry of orders, pursuant to 11 U.S.C. §§ 105(a) and 363(b); Fed. R. Bankr. P. 2002, 6004, 9014 and 9019; and L.B.R. 6004-1 and 9006-1 (i) approving the proposed bidding procedures set forth herein (the "Bidding Procedures") for the proposed sale of all of the shares (the "Shares") of Beach Community Bank (the "Bank", and collectively with BCB, the "Company")  to the David F. Bolger 2018 Irrevocable Stock Trust  ("Purchaser");

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stock Purchase Agreement, dated as of April 6, 2018 by and between BCB and the Purchaser (the "Agreement") attached hereto as Exhibit A.

(ii) approving certain bidding protections described herein, including the Minimum Overbids, the Bidding Increments, and the Stalking Horse Bidder Fee (the "Bidding Protections"); (iii) approving the form and manner of (a) the notice that will be filed with this Court and served on all creditors and parties-in-interest regarding the Sale and related Sale Hearing (as defined hereinafter) (the "Notice of Sale"); (iv) authorizing and approving the Sale, free and clear of all Encumbrances, to the Purchaser or to the Successful Bidder (as defined in the Bidding Procedures); (v) approving the release of all claims of the Debtor against the Purchaser (or the Successful Bidder) and the Bank; (vi) waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d); and (vii) granting related relief, including scheduling a hearing to approve the Sale (the "Sale Hearing"). BCB requests that the Court schedule a hearing within seven (7) days of the Petition Date to consider the proposed Bidding Procedures.  In support of this Motion, BCB states the following:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief herein are §§ 105(a), 363(b), and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended) (the "Bankruptcy

Code"); Rules 2002, 6004, 6006, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rule 2002-1, 6004-1, and 9014-1 of the Local Rules for the United States Bankruptcy Court of the Northern District of Florida  (the "Local Rules").

## BACKGROUND

2.      On April 9, 2018, (the "Petition Date") BCB filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  BCB continues to operate its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the Debtor's Chapter 11 case.  An official committee of unsecured creditors has not yet been formed or appointed.

**A.      Events leading to the Chapter 11 filing**

3.      BCB is a registered bank holding company within the meaning of the Bank Holding Company Act of 1956, as amended, that is incorporated under the laws of the State of Florida.  It is engaged in the banking business through its wholly owned banking subsidiary, Beach Community Bank, which was chartered in 2001.  The Debtor was incorporated in 2004 for the purpose of enabling the Bank to operate within a bank holding company structure. The Debtor's principal direct activity consists of owning the Bank, through which the Debtor derives substantially all of its revenues.

4.      The Bank is primarily engaged in business in Okaloosa, Santa Rosa, and Escambia counties.  As a result of the severe economic recession nationally and the corresponding downturn in the markets served by the Bank in the State of Florida, the Bank's asset values deteriorated during 2009 and 2010.

### i.    *Regulatory Action*

5.      The Bank and the Debtor are highly regulated entities.  The Bank and the Debtor's principal regulators are the Federal Deposit Insurance Corporation ("FDIC"), the State of Florida, Office of Financial Regulation, ("OFR") and the Federal Reserve Bank of Atlanta (the "FRB" and with the OFR and FDIC, the "Regulators").

6.      On March 15, 2010, the Bank, the FDIC and the OFR entered into a written consent order (the "Consent Order").  Among other things, the Consent Order requires the Bank to raise its Tier 1 Leverage Ratio to 8%.[2]  As of February 28, 2018, the Tier 1 Leverage Ratio of the Bank was 2.68%.

---

[2]   The Tier 1 Leverage ratio (formerly the capital ratio) is a measure of a banking firm's core equity capital and total risk-weighted assets. A firm's core equity capital is known as its Tier 1 capital and is the measure of a bank's financial strength based on the sum of its equity capital and disclosed reserves.  A firm's risk-weighted assets include all assets that the firm holds that are systematically weighted for credit risk. Central banks typically develop the weighting scale for different asset classes, such as cash and coins, which have zero risk, versus a letter or credit, which carries more risk.  Regulators use the Tier 1 Leverage ratio to grade a firm's capital adequacy as one of the following rankings: well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized.  Presently, a firm must have a Tier 1Leverage ratio of 6% or greater, and not pay any dividends or distributions that would affect its capital, to be classified as well-capitalized.  Firms that are ranked undercapitalized or below are prohibited from paying any dividends or management fees.  In addition, they are required to file a capital restoration plan. *See*  http://www.investopedia.com/terms/t/tier-1-capital-ratio.asp#ixzz3eOestHGa

7.     On June 1, 2010, BCB entered into a written agreement with the FRB (the "FRB Agreement").  Among other things, the FRB Agreement requires BCB to submit to the FRB a written capital plan sufficient to maintain adequate capital on a consolidated basis with the Bank.

8.     Since the entry of the Consent Order and the FRB Agreement, the Debtor has been engaged in an effort to secure additional capital to meet the regulatory thresholds.  The failure to meet those requirements could result in the Regulators taking additional actions against the Bank.  Absent conformance to the terms of the Consent Order, the Debtor and the Bank are prohibited from making any payment of subordinated debt principal or interest without regulatory approval.

9.     BCB commenced this case in accordance with the requirements of a written Purchase Agreement dated April 6, 2018 (the "Agreement"), which will permit the sale of the Debtor's stock in the Bank and the injection of new capital into the Bank in an amount sufficient to comply with the existing regulatory order. The proposed sale, subject to higher and better counter-offers in accordance with the terms of any bid procedures established by the Court, is to the Purchaser (David F. Bolger 2018 Irrevocable Stock Trust).

10.     The sale of the Shares to the Purchaser will generate sale consideration of $850,000, of which $500,000 will be distributed to the creditors of BCB, after the satisfaction of any administrative expenses that may be allowed by

the Court.  [For avoidance of doubt, any administrative expenses to be paid from the estate will be limited to an amount that yields no less than $500,000 to the creditors of BCB.]  The successful completion of the proposed sale transaction will, in turn, allow the Bank to issue new equity securities pursuant to certain written Stock Subscription Agreements (collectively, the "SSAs") that will generate new equity of approximately $100 million to recapitalize the Bank and allow the Bank to continue to serve the interests of its customers, depositors, borrowers, employees and creditors.

## B.    Debtor's Capital Structure

### i.    Creditors of the Debtor

11.    The Debtor has two creditors, U.S. Capital Funding V, Ltd. ("US Cap V") and U.S. Capital Funding VI, Ltd. ("US Cap VI" and with US Cap V, the "TruPS Holders" ) the holders of certificates issued in accordance with a written indenture (the "Trust Preferred Obligations" or "TruPS").  On June 14, 2006, the Debtor issued $12,372,000 Floating Rate Junior Subordinated Deferrable Interest Debentures due September 23, 2036, the securities bear interest at a variable rate per annum, reset quarterly, equal to LIBOR plus 1.55 percent, with an outstanding balance as of the petition date of $14,691,584.

12.    The Debtor formed and capitalized the TruPS through the Beach Community Statutory Trust I (the "Trust").  The Debtor owns 100% of the issued

and outstanding common securities of the Trust.  The Trust is a Delaware statutory trust that was established for the sole purpose of issuing capital securities.  The beneficial interests in the Trust are held by US Cap V and with US Cap VI.

13.    Under the trust preferred securities framework, the issuing company forms a business statutory trust and holds 100% of the common stock of the trust. The trusts in turn issue preferred stock to investors.  The proceeds from the preferred stock are paid to the issuing company.  The company then issues subordinated debt[3] to the trust on the same terms as the trust's preferred stock and guarantees the interest and maturity payments on the trust preferred stock. Generally, the company then downstreams those funds to the subsidiary bank.  The Debtor used the proceeds of the notes to invest capital in the Bank.  The trust preferred securities as issued under this framework were included in the Tier 1 Capital of the subsidiary bank thereby permitting further growth.  Under the proposed capital structure, it was contemplated that the Bank then in turn would make dividend payments to the Debtor enabling it to service the obligations under the notes.  As is typical for these securities, they each have an option to defer all interest due under the notes for a period of five years, absent default.  As the operating Bank is the sole source of repayment for the Trust Preferred Securities,

---

[3] The TruPS are unsecured.

7

any weakness in the Bank or inability to make payment impairs the value of the Trust Preferred Securities.

14.     Prior to the commencement of this case, the Debtor, at the request of the TruPS Holders, commenced the process of dissolving the Trust.  While the direct beneficial interest in the indebtedness is held by US Cap V and US Cap VI, the Debtor will also continue to provide notice to the indenture trustee.

15.     The Debtor has no other creditors.

**C.     Prior efforts to recapitalize**

16.     During the entire time period from the entry of the Consent Order to the present, the Debtor and the Bank have been diligently pursuing alternative solutions to meet the required capital ratios and otherwise satisfy the obligations of the Consent Order. These alternatives have included raising outside capital with the assistance of the Debtor's legal and financial advisors. The Debtor has also focused its efforts on improving the overall financial performance and efficiency of the Bank.

17.     The Bank's lending base consists primarily of real estate loans, with a substantial portion of that portfolio dedicated to loans related to acquisition and development of real estate. The Bank was severely affected by the national economic recession and then, with others in the area, was adversely affected by the

April, 2010 explosion of the *Deepwater Horizon* drilling platform and the resultant regional economic impact.

18.     For over 8 years, since 2010 and the entry of the Consent Order, BCB and the Bank have been actively engaged in the search for new equity to address the outstanding Trust Preferred obligations and to bring the Bank into conformance with the Consent Order by raising new capital.

19.     As part of these efforts the Debtor and the Bank engaged the Hovde Group, LLC ("Hovde") to act as a financial advisor and placement agent for raising new equity value at the Bank level.

20.     BCB and the Bank have been unable to create a new capital structure and also reach an accommodation with the TruPS Holders without providing for the commencement of a bankruptcy case that would offer sufficient comfort to the Purchaser of the Shares and the parties to the SSAs with the Bank and also satisfy the requirements of the TruPS Holders.

21.     Subsequent to negotiating the Agreement and the SSAs, the Debtor has also engaged Teneo Securities, Inc. ("Teneo") to assist it marketing the Shares as part of the proposed bidding procedures.

### i.     *Identity of Purchaser*

22.     The David F. Bolger 2018 Irrevocable Stock Trust is a trust formed for the purpose of purchasing the Shares and is represented by its trustee, Mr.

Thomas Wells.    Mr. Wells is the senior partner of the law firm Wells, Jaworski &

Liebman, LLP.  In addition to his legal practice, Mr. Wells serves as a Director and

Chief Executive Officer of the Bolger Foundation, as a Director and President of

the Wells Mountain Foundation, and as Managing Member of Wells Mountain

LLC, a real estate development, ownership and hospitality company.

23.    The Purchaser is a party to an SSA and in addition to acquiring the

Shares will participate in the new equity offering by the Bank.  At the closing of

the transactions, if the Motion is allowed by the Court,  the Purchaser will hold an

equity interest in the Bank with voting rights no greater than 9.9%, as explained

below.

## ii.    *Restructuring Support Agreement*

24.     Prior to the commencement of the case, the Debtor entered into a

written restructuring support agreement (the "RSA") with the TruPS Holders.  The

RSA incorporates a term sheet that sets forth with particularity the proposed terms

of the Bidding Procedures sought in the Motion, including, but not limited to, the

Solicitation Period (30 days), the Break Up Fee ($250,000), the Purchase Price

($850,000) and the net payment to the TruPS Holders ($500,000).  The terms of

the RSA were the subject to extensive negotiations between the TruPS Holders and

the Debtor.  Under the terms of the RSA, the TruPS Holders, the only creditors of

the Debtor, have agreed to support the relief requested in the Motion. A copy of the RSA is appended to the Agreement.

**D.     The Stock Purchase Agreement**

25.     The Debtor and the Purchaser, subject to the review and approval of the Court, have entered into the written Agreement.  A true and accurate copy of the Agreement is attached hereto as <u>Exhibit A</u>.  If effectuated, the transactions contemplated by the Agreement and the SSAs will recapitalize the Bank, ensure the Bank's regulatory compliance, maximize the value available for the Debtor's creditors, preserve jobs, and save banking regulators substantial amounts, while simultaneously allowing the Bank to continue serving the needs of its customers.

26.     The Purchaser is prepared to proceed with a transaction to acquire 100% of the stock in the Bank owned by the Debtor for $850,000.  The Purchaser and other third party investors (the "<u>Third Party Investors</u>") will at the same time enter into the SSAs to provide approximately $100 million in consideration of new equity to be issued by the Bank (the "<u>Equity Contribution</u>").

27.     If the Court approves the Stock Purchase Agreement, two directors of the Debtor and the Bank and the Chief Executive Officer of the Debtor and the Bank intend to become investors as part of the SSAs.  The director investments would be in the amount of $200,000 and $20,000 and the officer investment in the amount of $50,000, or collectively .27% of the total investment being raised.

28.    The Debtor, its management and its Board of Directors, have been engaged in an intensive effort to solve the problems of the Debtor and the Bank over a prolonged period of time and firmly believe that this solution, the Agreement with the Purchaser, presents the best opportunity for creditors and all parties in interest.

**E.    Key terms and conditions of the Stock Purchase Agreement**

29.    Pursuant to the Agreement, BCH will sell 100% of the stock in the Bank (the "Shares") to Purchaser free and clear of all Encumbrances.    The following highlights some of the key terms and conditions of the Agreement, all of which are more fully explained in the Agreement.

**Consideration.**    The purchase price for the acquisition of the Shares will be an amount equal to Eight Hundred Fifty Thousand Dollars ($850,000) cash (the "Purchase Price").

**Closing Date and Closing Conditions**.    The Sale is subject to approval by the Court and competitive bidding pursuant to the Bidding Procedures Order. Further, consummation of the sale transaction is jointly subject to certain closing conditions, such as the following:    (i) Court approval of the Bidding Procedures proposed herein including, without limitation, the Stalking Horse Bidder Fee, (ii) the entry of the final Sale Order by the Court; (iii) the parties obtaining all necessary governmental authorizations including without limitation, the approval of the Board of Governors of the Federal Reserve System, the FDIC and the Florida OFR; (iv) the successful closing of the new equity raise through the SSAs; and (v) the successful sale by the Bank of certain nonperforming assets.

**No-Shop Provision**. BCB is authorized to solicit competing proposals to purchase the Bank shares in accordance with the Bidding Procedures Order, but not otherwise.

**Release**.  In connection with Purchaser's acquisition of the Bank, Purchaser requires that the Debtor and the Bank release the Purchaser from any obligations or claims.

**Credit Bidding**.   The Purchaser shall retain the right to credit bid the Stalking Horse Bidder Fee at any auction that may be held with respect to the Shares.

**Waiver of Bankruptcy Rule 6004(h).**   In light of the regulatory and financial pressures on BCB and the Bank, BCB has requested a waiver of the stay imposed by Bankruptcy Rule 6004(h).

### F.    The Stock Subscription Agreement

30.    As of the date of the Agreement, the Bank has separately entered into the SSAs with the Purchaser and the Third Party Investors.  A true and accurate copy of the form of SSA is attached to the Agreement.

31.    Under the terms of the SSAs, the Bank will issue approximately 13.3 million shares of new common stock and 5.4 million shares of preferred stock raising not less than $95 million and not more than $100 million.  No Third Party Investor will hold voting rights greater than  9.9%, although in some instances their equity interests may exceed that margin.

32.     The SSAs require, among other things, that the proposed Sale Order be entered by the Court and that the transactions contemplated by the Agreement and the SSAs receive regulatory approval.  The SSAs have an Outside Date, by which the transactions must close, of July 5, 2018.  The Debtor anticipates that the time to close and receive the necessary regulatory approvals following the entry of

the Sale Order is approximately 60 days.  After the Outside Date, the Purchaser and the Third Party Investors will no longer be obligated to purchase the new equity to be issued by the Bank.

33.    The SSAs are also conditioned on the successful sale by the Bank of certain nonperforming assets [SSA, § 2.2(b)(xi), page 13] that must yield losses from book value of not more than $43 million.  The Bank has a reasonable belief that it will be able to successfully close under this condition.

34.    The SSAs require the Agreement to successfully close and the Bidding Procedures Order and Sale Order to be entered in accordance with the terms of Agreement.  The Third Party Investors have each provided the Purchaser with certain written authority to modify their respective SSAs in certain respects relating to the conduct of any Auction and the entry of the Bidding Procedures Order.

35.    As part of the new equity raise through the SSAs, the Bank intends to supplement its existing management team.  Those efforts will include the addition of Carl J. Chaney as the anticipated executive chairman of the Bank. Mr. Chaney has over 30 years of experience in the banking industry.

**G.    Regulatory approval of the sale**

36.    During the months preceding BCB's bankruptcy proceeding, the Company's management engaged in discussions with the Regulators to keep them apprised of the Company's recapitalization efforts.

37.    The Company has disclosed the Purchaser's proposed acquisition of the Bank as a proposed mechanism for recapitalizing the Bank.  Although still reviewing the proposed transaction, to date, the Regulators have raised no objections to this bankruptcy filing or the proposed Agreement.  BCB believes that it can timely obtain all requisite approvals from the Regulators for approval of the Agreement.

### H.    Proposed timeline for sale of assets

38.    The Purchaser and the Third Party Investors deem it essential to their success in acquiring the Bank and successfully closing under the Agreement to do so on an accelerated timeline.  The pendency of these proceedings will create a certain level of uncertainty that is inimical to the welfare of the Bank and its future operations. As the Agreement closing is contingent on regulatory approval of the Agreement and the new equity raise represented by the SSAs, and the prospects for the success of that process will diminish the longer the pre-sale uncertainty exists, it is important to the efforts of BCB to deliver the substantial value represented by the Agreement that it succeed in carrying out the sale process as promptly as possible.

39.    BCB proposes the following timeline in connection with the relief sought in this Motion:

| EVENT | DATE |
|---|---|
| Bidding Procedures Hearing[4] | Within 7 days of Petition Date |
| Deadline for competing bids | 5 days before Sale Hearing |
| Auction Date (if necessary) | 3 days before Sale Hearing |
| Sale Hearing[5] | Within 30 days of Bidding Procedures Hearing |

40.    BCB believes that after more than eight years of exploring potential alternatives for recapitalizing the Bank, every party that reasonably could be expected to consummate a transaction to purchase, recapitalize, or merge with BCB is aware of the opportunity.  Accordingly, BCB believes that the proposed timeline is more than sufficient to complete a fair and open process that will maximize value for the assets.

**RELIEF REQUESTED**

41.    By this Motion, BCB seeks entry of a "Bidding Procedures Order", a copy of which is attached here to as Exhibit B, which (i) approves the Bidding Procedures; (ii) approves the Bidding Protections, including the Stalking Horse

---

[4] Agreement, Section 5.9(a) requires the Bidding Procedures Order to enter within 10 days of the Petition Date.
[5] Agreement, Section 5.9(b) requires the hearing to be held within 30 days of the entry of the Bidding Procedures Order.

Bidder Fee, the Initial Minimum Overbid, and the bidding increments described below; (iii) approves the form and manner of the Notice of Sale; and (iv) grants related relief.

42.    Further, by this Motion, BCB requests that the Court set a Sale Hearing within thirty (30) days of the entry of any Bidding Procedures Order.  At the Sale Hearing, subject to the outcome of the Auction (if necessary), BCB requests entry of an Order in substantially the form attached hereto as Exhibit C (the "Sale Order" ), which, among other things, (i) approves the Agreement; (ii) confirms that the sale of the Shares shall be free and clear of all Encumbrances; (iii) waives the 14-day stay incorporated by Bankruptcy Rules 6004(h) and 6006(d); and (vii) approves certain findings of fact and conclusions of law, including, without limitation, that all requirements imposed by Bankruptcy Code section 363(f) have been satisfied, that the Purchaser is a good faith purchaser entitled to the protections of Bankruptcy Code section 363(m), and that the terms of the Sale are fair and reasonable.

## BASIS FOR RELIEF

### A.    Necessity for sale

43.    BCB has concluded that the only way to recapitalize the Bank (avoiding the risk of its seizure by regulators), and thereby realize value for BCB and its stakeholders, is to conduct a sale of the Bank pursuant to Section 363 of the

Bankruptcy Code.  BCB submits that the proposed sale, on the timeframe set forth herein, provides for the maximum value for BCB and its stakeholders.

44.    It is imperative that the sale process be conducted in an expeditious manner for a number of reasons.  First, as a result of BCB's required public announcement of this bankruptcy filing, there is a potential for customer confusion.[6] Notwithstanding the fact that substantially all of the Bank's customer deposits are fully protected by FDIC insurance, during any prolonged period of uncertainty, customers may become concerned and may look elsewhere for banking services, harming the value of the assets of the Debtor's estate.

45.    Second, the universe of potential investors who have both the financial backing and ability to satisfy the regulatory prerequisites to consummate a purchase of the Bank is very small.  Accordingly, prolonging the process in order to attempt to find other alternatives would be futile and a waste of estate assets.

46.    The Company has invested substantial time, effort and resources in assembling the proposed investor group and is at risk of losing this last opportunity to recapitalize absent the conclusion of the sale.  Failure to timely consummate the proposed Sale could cause the Company to lose the one opportunity that will allow it to optimally recapitalize the Bank and preserve value for BCB and its creditors.

---

[6] Indeed, this precise scenario happened to IndyMac. Depositors withdrew a total of $1.3 billion after certain third-party statements sparked widespread panic. Reuters' News, *U.S. seizes IndyMac as financial troubles spread*, July 12, 2008, *available at* http://www.reuters.com/article/idUSWA000014120080712.
.

47.    In sum, BCB submits that the proposed timeline and procedures described herein achieve the overarching objectives of the Company: recapitalizing the Bank as required by the Regulators and preserving the Bank's going concern for the benefit of its stakeholders.

**B.    The proposed bidding procedures**

48.    BCB crafted the Bidding Procedures to permit an expedited sale, as necessitated by the risks faced by the Bank, while simultaneously fostering an orderly and fair sale process. BCB has determined that the Bidding Procedures establish a framework that will maximize the value of the Bank for the benefit of BCB's estate, its creditors, and other interested parties.

49.    The proposed Bidding Procedures are attached to the Bidding Procedure Order as Exhibit B.  Those procedures are summarized in relevant part below subject to qualifications outlined in the Bidding Procedures.[7]

> **Participation Requirements.**  Before a potential bidder may receive any confidential information from BCB or the Bank, submit an Initial Overbid (defined below), or participate in the Auction, a potential bidder other than the Purchaser (an "Overbidder") must submit each of the following to BCB:  (i) an executed confidentiality agreement and (ii) current audited financial statements and the latest unaudited financial statements (collectively, the "Financials").

---

[7]The summary of the Bidding Procedures set forth herein is provided for informational purposes only. Interested parties should read the entire Bidding Procedures, which are annexed hereto as part of Exhibit B.  In the event of any conflict between the Bidding Procedures and this summary, the Bidding Procedures shall control.  Capitalized terms used in this summary have the meaning ascribed to them in the Bidding Procedures.

**Bid Deadline.** In order to participate at the Auction, an Overbidder must submit its bid in a form acceptable to BCB (with copies to certain professionals as explained in the Bidding Procedures) on or before five (5) days before the Sale Hearing (the "Bid Deadline").

**Bid Requirements.** A bid must be a written irrevocable offer from an Overbidder and shall contain, among other things, the following: (a) a proposed purchase agreement (the "Competing Purchase Agreement") on substantially the same terms and conditions as those in the Agreement; (b) a cashier's check made payable to the order of BCB in the amount of ($350,000) (the "Overbidder's Deposit") which will be retained by BCB as a deposit; (c) admissible evidence in the form of affidavits or declarations establishing, among other things, the Overbidder's financial ability, good faith, and ability to perform the obligations under the Competing Purchase Agreement (collectively, the "Bidder Representations"); (d) confirmation that the offer will remain open until one business day after the Closing; (e) terms and conditions that are higher and better than the terms and conditions of the Agreement; (f) a bid that exceeds the Closing Consideration by at least the sum of the Stalking Horse Bidder Fee and $100,000 (the "Initial Minimum Overbid") and provides for the recapitalization of the Bank on terms not less favorable than the Agreement and that have are acceptable to the Regulators; (g) sufficient information to establish that the Overbidder is capable of obtaining all required regulatory approvals required to consummate the Sale; and (h) a statement indicating that the Overbidder consents to the core jurisdiction of the Bankruptcy Court for all disputes relating to the Auction or the Sale.

**Qualified Overbidders and Initial Overbid.** A "Qualified Overbidder" is any potential Overbidder that both: (i) conforms with the above requirements by submitting a Competing Asset Purchase Agreement, supporting documentation and the Overbidder's Deposit (collectively, an "Initial Overbid"); and (ii) that the Company has determined is reasonably likely to consummate the Sale if selected as the Successful Bidder. The Purchaser shall automatically be deemed a Qualified Overbidder. Only Qualified Overbidders may bid for the Shares at the Auction. Any bid submitted by a Qualified Overbidder shall be referred to as a "Qualified Bid."

**Due Diligence.** Neither the Company, nor any of its employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors, or professionals are responsible for, and shall bear no liability with respect to, any information obtained by potential bidders in connection with the Sale. The Company shall not be obligated to furnish any due diligence information after the Bid Deadline. Each Overbidder shall comply with all reasonable requests for additional information and due diligence by the Company or its advisors regarding the Overbidder and its proposed transaction. Failure by an Overbidder to comply with requests for information and due diligence access shall be a basis for the Company to determine that such Overbidder is not a Qualified Overbidder.

**Bidder Protections.** In order to provide an incentive and compensate the Purchaser to serve as the stalking horse bidder, BCB has agreed to provide the Buyer with certain bidder protections commonly approved in other bankruptcy sales. In the event that the Buyer is not the Successful Bidder for the Shares, the Purchaser shall be entitled to collect a $250,000 fee from BCB (the "<u>Stalking Horse Bidder Fee</u>"), which fee will be paid from the sale consideration received from the Successful Bidder.

**As Is, Where Is.** The sale of the Shares shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by BCB, its agents, its advisors, or estate, except to the extent set forth in the Agreement or in BCB's purchase agreement(s) with the Successful Bidder(s). Except as otherwise provided in the Agreement or the purchase agreement(s) with the Successful Bidder(s), all of the right, title and interest in and to the Shares to be acquired will be sold free and clear of all liens, security interests, encumbrances, and interests thereon and there against (collectively, the "<u>Encumbrances</u>"). The Encumbrances will attach to the net proceeds of the sale of such Shares, subject to any claim of the Purchaser to such proceeds for payment of the Stalking Horse Bidder Fee (as defined above).

**The Auction.** If on the Bid Deadline, the Purchaser is the only Qualified Overbidder, BCB shall not conduct an Auction. Rather, BCB shall request at the Sale Hearing that the Bankruptcy Court approve the proposed Sale of the Shares to the Purchaser under the Agreement and request that the Sale Order shall be immediately

effective upon entry.  If, on the Bid Deadline, there is more than one Qualified Overbidder, BCB will conduct an auction of the Shares (the "Auction"), subject to approval of the Bankruptcy Court, in which the Purchaser and all other Qualified Overbidders may participate.

Auction Procedures.  The Auction will be governed by the following procedures, the most significant of which include the following (the "Auction Rules"):  (a) bidding will commence at the amount of the highest bid submitted by a Qualified Overbidder, as determined by BCB; (b) each subsequent bid after the Initial Minimum Overbid will be in increments of no less than One Hundred Thousand Dollars ($100,000) (the "Bidding Increments"); (c) the Purchaser will have the right, but not the obligation to match bids made by any Qualified Overbidder (and credit the amount of the Stalking Horse Bidder Fee), and in such event, the Purchaser matching bid will be deemed the highest and best bid for the Shares; (d) the Auction shall continue until there is only one Qualified Bid that BCB determines in its reasonable business judgment, after consultation with its advisors, is the winning bid; (e) if, upon conclusion of the Auction the Purchaser's final bid matches (or is greater than) the highest bid made by any Qualified Overbidder, BCB will seek the approval of the Bankruptcy Court  to sell the Shares to the Purchaser;  and (f) BCB may elect to deem the Purchaser's final bid to be the highest bid, notwithstanding the receipt of an apparently higher bid from another Overbidder.

## C.    Notice procedures

**50.**    BCB shall, within two (2) days of the entry of the Bidding Procedures Order on this Court's docket, serve a copy of each of the Motion, the Bidding Procedures Order, and a copy of the Notice of Sale, substantially in the form attached hereto as Exhibit 2 to the Bidding Procedures Order by first-class mail, postage prepaid, upon the following parties (collectively, the "Notice Parties"):

(a) the Office of the United States Trustee for the Northern District of Florida (the

"<u>U.S. Trustee</u>"); (b) all parties that have filed requests for notices under

Bankruptcy Rule 9010(b) or are entitled to notice under Bankruptcy Rule 2002;

(c)  U.S. Capital Funding V, Ltd. ("US Cap V") and U.S. Capital Funding VI, Ltd.

("US Cap VI"), the holders of trust preferred securities originally issued by Beach

Community Statutory Trust I (the "<u>Trust  Preferred</u>"); (d) Wilmington Trust

Company, formerly the Indenture Trustee for the Trust  Preferred ("<u>Wilmington</u>

<u>Trust</u>"); (e) the Internal Revenue Service; (f) the holders of Preferred Stock in the

Debtor; (g) Purchaser and (e) any governmental entity affected by the relief sought

herein.

## <u>APPLICABLE AUTHORITY</u>

**I.     The Sale Should be Approved Under Section 363(b) as Fair, Reasonable, and in the Best Interest of Creditors.**

51.     Bankruptcy Code section 363(b) and Bankruptcy Rule 6004 authorize

a debtor to sell assets of the estate other than in the ordinary course of business,

after notice and a hearing. In accordance with Bankruptcy Rule 6004(f)(1), sales of

property outside of the ordinary course of business may be by private sale or public

auction.  <u>See</u> Fed. R. Bankr. P. 6004(f)(1).  Here, BCB believes that its ability to

select the highest and best bidder at the Court-supervised Auction enhances and

benefits the marketing process by providing a motivation for bidders to submit a

Qualified Bid with a high market value.

52.     Although section 363(b) does not specify a standard for determining

when it is appropriate for a court to authorize the use, sale or lease of property of

the estate, case law has repeatedly confirmed that such use or sales of estate assets

is appropriate if the sales or uses are based upon a debtor's sound business

judgment.  See In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497, 514 (Bankr.

N.D. Ala. 2002) (providing that the business judgment standard should be used

when evaluating a sale motion under section 363(b)); In re Tropical Sportswear

Int'l Corp., 320 B.R. 15, 17-18 (Bankr. M.D. Fla. 2005) (applying sound business

justification standard in authorizing payment of prepetition claims pursuant to

section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D.

Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale

or lease of property under Section 363(b), courts consider a variety of factors,

which essentially represent a '*business judgment test*.'") (emphasis added).   This

"business judgment test" requires that: (i) there is a sound business reason

justifying the sale; (ii) adequate and reasonable notice of the sale has been

furnished to interested parties; (iii) the sale price is fair and reasonable; and (iv) the

purchaser has acted in good faith.  See In re Delaware & H.R. Co., 124 B.R. 169,

176 (D. Del. 1991); see also In re Lorraine Brooke Associates, Inc., No. 07-12641-

BKC-AJC, 2007 WL 2257608, at *4 (Bankr. S.D. Fla. Aug. 2, 2007) (applying

business judgment standard as defined in <u>In re Delaware</u>). All of these factors are satisfied here.

## II. There is a Sound Business Reason for the Sale.

53. Once a business justification is articulated, a presumption arises that the directors acted on an informed basis, in good faith, and in the best interest of the company, and courts show great deference to the debtor's business decisions. <u>See In re First Foliage, L.C.</u>, No. 10-27532-BKC-LMI, 2011 Bankr. LEXIS 1979, * at 11 (Bankr. S.D. Fla. February 14, 2011) (authorizing sale of substantially all of the debtor's assets and finding that the sale transaction was undertaken in good faith without collusion); <u>In re ALH Holdings LLC</u>, 675 F. Supp. 2d 462, 477 (D. Del. 2009) (business judgment rule "creates a presumption that 'in making a business decision the directors of a corporation acted on an informed basis, in good faith …'" -- overcoming this presumption is a "near-Herculean task"); <u>In re S.N.A. Nut Co.</u>, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (if the procedures utilized by the directors are applied fairly, and if the directors do not violate any of their fiduciary duties their decision will not be second-guessed); <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (the business judgment rule's presumption "shields corporate decision-makers and their decisions from judicial second-guessing"); <u>In re Johns-Mansville Corp.</u>, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (signaling <u>In re Curlew Valley Assoc.</u>, 14 B.R. 506, 513 (Bankr. D. Utah

1981) (where the debtor articulates a reasonable basis for its business decisions "courts will generally not entertain objections to the debtor's conduct")); Pitt v. First Wellington Canyon Assoc. (In re First Wellington Canyon Assoc.), 1989 WL 106838, *3 (N.D. Ill. 1989) (the debtor's business judgment must be accorded deference unless the debtor's decision was "taken in bad faith or in gross abuse of the debtor's retained discretion").

54.    In this analysis courts use an illustrative list of considerations, on a case-by-case basis, to determine whether the business justification is sufficient, including:

- The proportionate value of the asset to the estate as a whole;

- The amount or elapsed time since filing the petition;

- The effect of the proposed disposition on the  future plans of reorganization;

- The amount of proceeds to be obtained from a disposition compared to a valuation of the asset; and

- Most importantly, whether the asset is increasing or decreasing in value.

In re Tidal Constr. Co., 446 B.R. 620, 623 (Bankr. S.D. Ga. 2009); In re Continental Airlines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986) (citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983)); Matter of Baldwin United Corp., 42 B.R. 888, 905-06 (Bankr. S.D. Ohio 1984)).

55.    Here, BCB's business justification is made much easier given the unique nature of the Bank as a regulated entity, and the current state of the financial markets:

- The proportionate value of the Shares to the estate is substantial given that BCB is a financial services holding company and the Shares represent all of its assets;

- The Company has been subject to the terms of the Consent Agreement with Regulators for eight years (8) years;

- The Bank has been marketed extensively, and the Sale will be subject to a competitive bidding process as set forth in the Bidding Procedures;

- As of the date hereof, despite extensive marketing,  BCB and the Bank have received no other offers to purchase the Shares other than from the Purchaser;

- The Agreement is the result of an arm's length negotiation that will result in a net payment of $500,000 and will result in the operations of the Bank becoming well-capitalized; and

- Finally, and most importantly, the failure to close the sale transaction could result in actions by the Bank's regulators, which could, in turn, severely impact creditor recoveries.

Therefore, sound business justifications exist enabling this Court to approve implementation of the Bidding Procedures and, ultimately, a sale of the Bank.

### III.    The Bidding Procedures Provide Adequate and Reasonable Notice of the Sale.

56.    Section 363 of the Bankruptcy Code requires that interested parties receive adequate notice of the sale. Full disclosure of the terms of the Sale will be provided through transmittal of the Notice of Sale as described above. Such notice

is reasonably calculated to provide timely and adequate notice to BCB's major creditor constituencies, those parties most interested in this case, those parties that may have an interest in the Shares, and those parties potentially interested in bidding on the Shares.

## IV.    The Purchase Price is Fair and Reasonable.

57.    An auction sale is generally considered to establish sufficient value for the assets being sold.  See, e.g., In re TWA, Inc., 2001 Bankr. LEXIS 980, *13 (Bankr D. Del. 2001) ("The auction procedure [in a 363 sale] has developed over the years as an effective means for producing an arm's length fair value transaction."); In re Celotex Corp., 204 B.R. 586, 612 (Bankr. M.D. Fla. 1996) (equating the value of the debtor's assets to the value received from a hypothetical auction sale of such assets).  BCB believes that the sale process has been structured in a manner that will secure the highest purchase price for the assets being sold. BCB and Hovde have extensively marketed the Company, the Bank and the Shares. That process culminated in the realization of the highest and best offer, from the third-party, non-insider Purchaser, to acquire the Shares.

58.    BCB will also provide a Notice of Sale to all known potential bidders, thereby maximizing the possibility that competing bidders will come forward to pay a higher price for the Shares than that offered by the Purchaser in the

Agreement.  In essence, the Purchaser has set the floor for the bidding at the Auction.

59.   BCB specifically retained Hovde to act as financial advisor to BCB and to assist BCB in identifying and analyzing possible transaction structures. Hovde has made presentations to the Board of Directors of BCB for the purpose of assisting the Board of Directors of BCB in making a reasoned and well informed decision regarding any course of action, which included, without limitation (i) a review of efforts to raise capital through a recapitalization of BCB and/or a business combination, and a sale to a strategic partner or buyer through a business combination or otherwise, (ii) a review of market conditions and comparable market transactions, (iii) an overview of the current regulatory environment as it relates to a recapitalization, (iv) an evaluation of the execution risk of one or more proposed transactions involving potential second parties, and (v) an analysis of, and advice regarding, existing bids.  That impartial analysis and advice helped BCB determine the basis for the purchase price set out in the Agreement, which further demonstrates the fairness and reasonableness of the Closing Consideration.

60.   Based on extensive marketing efforts and negotiations surrounding the Agreement, with the assistance of Hovde, BCB believes that the Purchaser's offer (subject to overbid at the Auction) satisfies the requirement that the price paid for the Shares be fair and reasonable.

**V.    The Sale is in Good Faith and Thus the Purchaser or the Successful Bidder Should be Afforded the Protections of 11 U.S.C. § 363(m)**

61.    Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to any entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

Although the Bankruptcy Code does not define "good faith," courts have found that the good faith requirement focuses principally on the disclosure of all material sale terms and absence of fraud or collusion between bidders.  See, e.g., In re Abbotts Dairies, 788 F.2d 143, 147-48 (3rd Cir. 1986).  It is typically only "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" that leads to a determination that there was a lack of good faith in a sale proceeding.  Id.

62.    The Agreement is a product of intensive arm's-length negotiations between BCB and the Purchaser, and does not contain special treatment for BCB, BCB's estate, the Purchaser, or their respective affiliates or insiders.    The Agreement specifically provides for overbids at the Auction.  Moreover, BCB submits that any purchase agreement reached as a result of the Bidding Procedures will be an arm's-length, negotiated transaction entitled to the protections of section

363(m). In addition, the terms of the Sale will be fully disclosed to creditors and other potential bidders pursuant to the Notice of Sale as described above.

63.     Based on the foregoing, the Purchaser or the Successful Bidder, as the case may be, should be deemed a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

## VI.    The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for the Sale of the Estate's Assets Free and Clear of Liens, Claims, and Encumbrances.

64.     Section 363(f) of the Bankruptcy Code permits debtors to sell assets free and clear of liens, claims, and encumbrances with interests in the property attaching to the net proceeds of the sale. Section 363(f) provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

65.     BCB believes that one or more of the tests set forth in section 363(f) are satisfied here. First and foremost, the Shares are not encumbered by any

recorded lien, security interest. To the extent there is any unrecorded interest in the Shares, BCB submits that Bankruptcy Code section 363(f)(5) would apply to permit the Sale free and clear of such interests.   In addition, because BCB is unaware of any interests or encumbrances upon the Shares, BCB submits that the assertion of any interests in those assets will be in bona fide dispute, requiring application of Bankruptcy Code Section 363(f)(4).

66.    Because BCB has satisfied one of the alternative conditions set forth in Section 363(f), BCB requests that the Shares be transferred to the Purchaser free and clear of all Encumbrances with interests in property attaching to the proceeds of the Sale of the Shares.

## VII.   The Proposed Bidding Procedures are Fair and Designed to Maximize the Value of BCB's Estate

67.    Bidding procedures should be approved where the debtor has exercised sound business judgment in developing those procedures.   See In re Holley Performance Prods., 2009 Bankr. LEXIS 4683, *5 (Bankr. D. Del. 2009); In re Gulf States Steel, 285 B.R. at 514. Here, BCB prepared the Bidding Procedures in order to maximize the potential recovery for BCB, the Bank, and their stakeholders in connection with the proposed Sale of the Shares.   The Bidding Procedures provide for an open bidding process that will provide all potential bidders with the opportunity to participate and test the Purchaser's proposed sale price through an auction process.   Because the Bidding Procedures are fair,

reasonable, and a sound exercise of BCB's business judgment, BCB submits that approval of the proposed Bidding Procedures is warranted.

## VIII. The Proposed Stalking Horse Bidder Fee is Necessary to Preserve the Value of BCB's Estate.

68.    This transaction is unique.  Any prospective Bank purchaser must not only compensate the estate for the value of the Shares, but must also obtain regulatory approval.

69.    In order to obtain regulatory approval, the Purchaser and the Third Party Investors have entered into the SSAs that will result in an equity contribution of approximately $100 million and thus committed substantial capital to shoring up and sustaining the operations of the Bank.  The size of this commitment will cause the Purchaser and the Third Party Investors to otherwise allocate and reserve capital for the potential sale under the Agreement that could be used for other purposes and opportunities.  The Purchaser is taking all of the steps necessary to obtain regulatory approval, including negotiation of the Agreement in a form tailored to gain the acceptance of the Regulators.  The Purchaser will also be required to invest the substantial cost and expense of pursuing the consummation of this transaction through the Bankruptcy Court.  Because BCB insisted that the transaction be subject to higher and better offers, the Purchaser understandably requested certain bidding protections and was unwilling to make this offer and

proceed with the Agreement without such protections.  BCB believes that approval of the Stalking Horse Bidder Fee will maximize realizable value of the Shares for the benefit of BCB's estate and creditors.

70.    Under the proposed Bidding Procedures, in the event the Purchaser is not the Successful Bidder for the Shares, BCB would be required to pay a Stalking Horse Bidder Fee of $250,000.[8]  Of course, in order for the Stalking Horse Bidder Fee to be triggered, the Purchaser would have to be out-bid by another Qualified Bidder in an amount exceeding the Stalking Horse Bidder Fee (plus an overbid amount).

71.    Approval of a stalking horse bidder fee is appropriate if such protections are necessary to preserve the value of the estate.  There are two primary ways that bid protections, such as a stalking horse bidder fee, create or preserve value for a debtor's estate.  First, bid protections can preserve value for the estate if assurance of the bid protections "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien"); see also Reliant Energy Channelview LP v. Kelson Channelview LLC,

---

[8] The Stalking Horse Bidder Fee will be divided between the Purchaser and the Third Party Investors in accordance with the provisions of Section 5.5 of the Agreement.  The Purchaser will also be entitled to a reimbursement of its legal expenses under the SSA in the amount of $100,000.  Other parties to the SSAs may also obtain fee reimbursements related to the SSAs.

594 F.3d 200, 206-07 (3d Cir. 2010) (hereinafter, "Reliant"); see also In re

Camtech Precision Mfg., No. 10-22760-PGH, 2010 Bankr. LEXIS 6045, at * 19

(Bankr. S.D. Fla. Dec. 23, 2010) (recognizing that bid protections are designed to

facilitate a full and fair process to maximize the value of the debtor's assets).

Second, if the availability of bid protections, such as a stalking horse bidder fee,

induce a purchaser to expend funds and conduct due diligence that determines the

true value of the debtor's assets upon which other bidders can rely, the purchaser

has created value for the estate by increasing the likelihood that the price at which

the debtor's assets are sold will reflect its true worth. Reliant, 594 F.3d at 206-07;

O'Brien, 181 F.3d at 537; see also Camtech Precision, 2010 Bankr. LEXIS 6045,

at * 19.

72.    Here, both of these conditions are satisfied.    As set forth above,

although the Regulators have placed pressure on the Bank compelling new outside

investment or a sale and the Company and Hovde (and predecessor advisors) have

diligently marketed the Bank for well over eight years, the Company has been able

to locate only one party—the Purchaser, acting together with the Third Party

Investors—that has set forth a viable offer to both recapitalize the Bank and allow

BCB to realize value from its most significant asset.  If BCB is unable to quickly

consummate the Sale, swift action could be taken by the Regulators, producing

disastrous consequences to BCB and its creditors. Thus, approval of the Stalking

Horse Bidder Fee is necessary to induce the Purchaser to make its proposed bid that will preserve the value that BCB will realize through the Sale and to gain the successful recapitalization of the Bank through the proposed new equity raise represented by the SSAs—failure to receive such a bid or consummate the Sale could erode any prospect of creditor recovery.

73. Moreover, the Stalking Horse Bidder Fee is necessary to compensate the Purchaser for the opportunity costs that it has lost through committing capital to this Sale transaction. The lost opportunity costs are significant.

74. Thus, the proposed Stalking Horse Bidder Fee is necessary to preserve the value of BCB's estate. The Stalking Horse Bidder Fee induced the Purchaser to make its initial bid, and granting this protection is also necessary to prevent the Purchaser from withdrawing its offer and compensate the Purchaser for the lost opportunity costs associated with setting forth in its Sale offer. The Purchaser only agreed to enter into the Agreement if it would receive the Stalking Horse Bidder Fee, and the Purchaser has agreed to consummate the Agreement only if it receives such protection. Without this protection, the Purchaser could walk away from the Agreement.

75. Furthermore, the proposed Stalking Horse Bidder Fee is fair, reasonable, and within the range of similar protections approved in other bank holding company cases where a bank has been sold. Based on the total

consideration (the sale price for the shares and the new equity being issued by the Bank) of $100,850,000, the proposed Stalking Horse Bidder Fee of $250,000 is in-line with stalking horse bidder fees approved in recent bank holding bankruptcy cases.  See In re Bankers Bancorporation of Florida, Inc., Case No. 15-05642 (Bankr. M.D. Fla. July 13, 2015, Docket No. 34) (approving breakup fee of $200,000 based on proposed cash purchase price of $1 million); In re Bank of Commerce Holdings, Inc., Case No. 16-08197 (Bankr. M.D. Fla. September 29, 2016, Docket No. 36) (approving $200,000 break-up fee based on cash of $750,000 to bankruptcy estate);  In re Premier Bank Holding Company, Case No. 12-40550 (Bankr. N.D. Fla. September 13, 2012) (approving breakup fee of $150,000 and expense reimbursement of $250,000 based on proposed cash purchase price of approx. $1.4 million); In re AmericanWest Bancorp., Case No. 10-06097 (Bankr. E.D. Wash. November 3, 2010) (approving $1 million breakup fee based on $6,500,000 purchase price).

76.    The Stalking Horse Bidder Fee is both reasonable and necessary to preserve the value of the estate's most valuable asset, including tying up equity capital in order to consummate the Sale and spending several months in order to develop a proper transaction structure.

**IX.    The Release of the Purchaser and the Bank as Part of the Sale is Appropriate and Necessary to the Sale and Authorized by Bankruptcy Rule 9019.**

77.    As part of the Agreement, the Purchaser has negotiated for and received the Debtor's agreement that it will release any claims that it has against the Purchaser and the Bank.

78.    The Debtor is not aware of any claims that it  holds against the Purchaser or the Bank.

79.    The standard in this Circuit for determining whether to approve a compromise or settlement pursuant to Bankruptcy Rule 9019(a) is set forth in Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.), 898 F.2d 1544 (11th Cir. 1990), in which the Eleventh Circuit stated:

> When a bankruptcy court decides whether to approve or disapprove a proposed settlement, it must consider:
>
> (a) The probability of success in the litigation;
>
> (b) the difficulties, if any, to be encountered in the matter of collection;
>
> (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
>
> (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Id. at 1549

80.    The releases provided for as part of the Agreement are normal and customary conditions.  The Debtor is aware of no claims that exist, and the Debtor believes that a sale cannot be consummated (and the value of its assets preserved) if the threat of future litigation hangs over the Bank or any purchaser.  The

transaction will prevent the Debtor from losing the only assets it has, provide a return to creditors of the Debtor and successfully recapitalize the Bank as required by the Consent Order.  The proposed releases otherwise satisfy the requirements of Rule 9019.

## X.    This Court Should Waive the Fourteen-Day Stay Period Imposed by Bankruptcy Rule 6004(h)

81.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  BCB requests that the stay imposed by Bankruptcy Rule 6004(h) be waived under the circumstances of this case.  It is in the interest of BCB's creditors and estate that the Sale be consummated as quickly as possible without any stay pending appeal because of the Bank's undercapitalized status, the risk of  deposit withdrawals, and the decisive response that the Regulators will implement in the event of significant deposit withdrawals.

82.    BCB will notice the hearing on this Motion to all of its creditors, interest holders, and other parties-in-interest, and therefore any person having any objection to the Motion will be afforded a reasonable opportunity to voice any objections or concerns.  Accordingly, BCB is aware of no prejudice that would be caused by the Court's waiver of Bankruptcy Rule 6004(h).  BCB requests that any

order approving the Sale be effective immediately by providing that the fourteen-day stay is inapplicable.

## NOTICE

83.    Notice of this Motion will be been provided to (i) all creditors of the estate; (ii) any entities known to have asserted any Encumbrance in or upon the Shares; (iii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion, including the Regulators; (iv) all parties to the Agreement; (v) the Office of the United States Trustee; (vi) the Internal Revenue Service; (vii) Wilmington Trust as indenture trustee; (viii) all entities that have requested notice in accordance with Bankruptcy Rule 2002;  and (ix) counsel to any official committee established in this Chapter 11 case. In light of the nature of the relief requested herein, BCB submits that no other or further notice is required.

## NO PRIOR REQUEST

84.    No prior request for the relief sought in this Motion has been made to this or any other court.

## REQUEST FOR EMERGENCY HEARING

85.    The proposed Agreement provides that the Bidding Procedures must be approved within ten (10) days of the Petition Date.  If the deadline is not met, the Debtor and the estate will lose the advantage of the Agreement.

86.    The need for expedited relief has not been created by lack of due diligence by the Debtor or its proposed counsel.

## CONCLUSION

For all of the foregoing reasons, BCB respectfully requests entry of an order granting the relief requested herein and such other and further relief as the Court deems just.

Beach Community Bancshares, Inc.

By its attorneys,


   /s/ CHARLES F. BEALL, JR.
CHARLES F. BEALL, JR.
FLORIDA BAR NO. 66494
MOORE, HILL & WESTMORELAND, P.A.
350 W. CEDAR STREET, SUITE 100
POST OFFICE BOX 13290
PENSACOLA, FL 32591-3290
TELEPHONE:  (850) 434-3541
CBEALL@MHW-LAW.COM
JPINETTE@MHW-LAW.COM
LJOHNSON@MHW-LAW.COM

Peter J. Haley
Mass. Bar No. 543858
Nelson Mullins Riley & Scarborough LLP
One Post Office Square, 30th Floor
Boston, MA 02109
(617) 271-4714
(617) 217-4750 (fax)
peter.haley@nelsonmullins.com

J. Brennan Ryan
Thomas D. Powell
Nelson Mullins Riley & Scarborough LLP
Georgia Bar No. 701563
201 17th Street NW
Suite 1700
Atlanta, GA 30363
(404) 322-6268
(404) 322-6050 (fax)
brennan.ryan@nelsonmullins.com
thomas.powell@nelsonmullins.com


*Proposed Counsel for the Debtor and Debtor
in Possession*

Dated: April 9, 2018

Index to EXHIBITS

Exhibit A – <u>Stock Purchase Agreement</u> (Exhibits C and D to the Stock Purchase Agreement have been omitted because they are otherwise attached to this motion)

Exhibit B – <u>Proposed Bidding Procedures Order</u>

Exhibit C -  <u>Proposed Sale Order</u>